Citation Nr: 1434242 
Decision Date: 07/31/14 Archive Date: 08/04/14

DOCKET NO. 06-13 505 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in San Juan, the Commonwealth of Puerto Rico


THE ISSUES

1. Whether new and material evidence has been received to reopen a claim of entitlement to service connection for a skin disability.

2. Entitlement to service connection for a skin disability.

3. Entitlement to service connection for a left knee disability to include as secondary to service connected disabilities. 

4. Entitlement to service connection for an acquired psychiatric disorder to include PTSD. 

5. Entitlement to a rating in excess of 60 percent for lumbosacral fibromyositis with radiculopathy. 

6. Entitlement to a rating in excess of 10 percent for status post right knee arthroscopy with meniscus repair. 

7. Entitlement to a compensable rating for chip fracture, right ulnar styloid.


REPRESENTATION

Appellant represented by: Puerto Rico Public Advocate for Veterans Affairs


ATTORNEY FOR THE BOARD

Russell Veldenz, Counsel


INTRODUCTION


The Veteran served on active duty from October 1955 to October 1957 and from August 1969 to August 1972

This matter is before the Board of Veterans' Appeals (Board) on appeal of December 2005 and March 2011 rating decisions by the San Juan, Puerto Rico, Department of Veterans Affairs (VA) Regional Office (RO).

This appeal came to the Board under two separate docket numbers but has been merged into one appeal at the Board and given the older of the two docket numbers as noted on the cover page of this decision. This assignment of the oldest docket number does not prejudice the Veteran as it preserves his place on the docket for any issues that are returned to the Board post-remand.

In August 2008, the Board remanded the case to the RO for additional development. As the requested development has been completed, no further action is necessary to comply with the Board's remand directives. Stegall v. West, 11 Vet. App. 268, 271 (1998).

As discussed below, the RO previously denied claims for service connection for a skin disability in a rating decision dated in August 1994. The Veteran never appealed that rating decision. By operation of law, the unappealed rating decision became final (hereinafter also referred to as finality). 38 U.S.C.A. § 7105. On the current claim for service connection, the RO never addressed whether to reopen the claim and adjudicate the claim on the merits. Where service connection for a disability has been denied in a final rating decision, a subsequent claim of service connection for the same disability may be considered on the merits only if new and material evidence has been received since the time of the prior adjudication.

The Board has jurisdictional responsibility to consider whether it is proper for a claim to be reopened, and what the RO determined in this regard is irrelevant. Jackson v. Principi, 265 F.3d 1366 (Fed. Cir. 2001). As noted, the Board has determined that the skin disability was finally adjudicated in August 1994. For this reason, the Board has styled the claim for a skin disability to reflect that finality had attached to the previous rating decision.

The Board notes that the Veteran, as a lay person, filed his claims as service connection for his skin disability claim and for a claim of service connection for PTSD. Multiple medical diagnoses that differ from the claimed condition do not necessarily represent a separate claim, and what constitutes a claim cannot be limited by a lay Veteran's assertion of his condition in his application, but must be construed based on the reasonable expectations of the non-expert claimant and the evidence developed in processing the claim. Clemons v. Shinseki, 23 Vet. App. 1, 4-5 (2009). Because the evidence indicates that the Veteran may have different conditions or diagnoses for both the skin disability and mental health disability, the Board has therefore stated the issues as set forth on the first page of this decision. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 38 U.S.C.A. § 7107(a)(2) (West 2002).

The issues of service connection for an acquired psychiatric disorder, service connection for a skin disease, and service connection for a left knee disability are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDINGS OF FACT

1. By a rating decision dated in August 1994, the RO originally denied a claim of service connection for a skin disability, and the Veteran did not appeal that determination, nor was any new and material evidence received within the appeal period thereafter.

2. Evidence added to the record since the August 1994 RO denial, considered in conjunction with the record as whole, relates to an unestablished fact necessary to substantiate the claim for service connection for a skin disability, and raises a reasonable possibility of substantiating the claim.

3. Throughout the rating period on appeal, lumbosacral fibromyositis does not manifest unfavorable ankylosis of the entire spine 

4. Throughout the rating period on appeal, the Veteran has objective neurological abnormalities for lumbosacral fibromyositis resulting in decreased sensation, pain, and some motor loss demonstrating no worse than moderate incomplete paralysis of the left lower extremity and moderate incomplete paralysis of the right lower extremity

5. Throughout the rating period on appeal, the Veteran's status post right knee arthroscopy with meniscus repair disability has been manifested by pain on active motion with flexion limited to 70 degrees upon repetitive motion, with no additional functional loss due to pain, fatigue, weakness, incoordination, or lack of endurance and normal extension.

6. Throughout the rating period on appeal the Veteran's right ulna disability, chip fracture, right ulnar styloid, has been manifested by complaints of pain and stiffness with some limitation of motion; ankylosis, or dorsiflexion less than 15 degrees, or limitation of motion of palmar flexion limited in line with the forearm has not been shown or more nearly approximated.


CONCLUSION OF LAW

1. The August 1994 rating decision which denied a claim to reopen the claim for service connection for a skin disability is final. 38 U.S.C.A. § 7105(c) (West 1991); 38 C.F.R. §§ 3.104, 20.302, 20.1103 (1994); currently, 38 U.S.C.A. § 7105(c) (West 2002 & Supp. 2013); 38 C.F.R. §§ 3.104, 20.302, 20.1103 (2013).

2. New and material evidence has been received since the August 1994 RO denial to reopen a claim of entitlement to service connection for a skin disability. 38 U.S.C.A. §§ 5108, 7104(b) (West 2002 & Supp. 2013); 38 C.F.R. § 3.156(a) (2013).

3. The criteria for a rating higher than 60 percent for lumbosacral fibromyositis have not been met. 38 U.S.C.A. §§ 1155 , 5107(b) (West 2002); 38 C.F.R. §§ 4.40 , 4.45, 4.59, 4.71a, Diagnostic Codes 5242, 5243 (2013).

4. The criteria for a separate 20 percent rating for radiculopathy of the left lower extremity and a separate 20 percent rating for radiculopathy of the right lower extremity have been met. 38 U.S.C.A. §§ 1155 , 5107(b) (West 2002); 38 C.F.R. §§ 4.40 , 4.45, 4.59, 4.71a, Diagnostic Codes 5242, 5243, 8520 (2013).
 
5. The criteria for an initial rating in excess of 10 percent for limitation of flexion for the Veteran's status post right knee arthroscopy with meniscus repair disability have not been met. 38 U.S.C.A. §§ 1155 , 5107 (West 2002); 38 C.F.R. §§ 3.321 , 4.3, 4.7, 4.14, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5257 5260, 5261 (2013).

6. The criteria for an evaluation of 10 percent for a right ulna disability have been met. 38 U.S.C.A. §§ 1155 , 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.321 , 4.3, 4.7, 4.14, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5215-5211 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA, codified in part at 38 U.S.C.A. §§ 5103, 5103A, and implemented, in part, at 38 C.F.R § 3.159, amended VA's duties to notify and to assist a claimant in developing information and evidence necessary to substantiate a claim.

As the claim to reopen service connection for a skin disability is resolved in the Veteran's favor, further discussion here of compliance with the VCAA with regard to that claim is not necessary.

Duty to Notify

When VA receives a complete or substantially complete application for benefits, it will notify the claimant of the following: (1) any information and medical or lay evidence that is necessary to substantiate the claim, (2) what portion of the information and evidence VA will obtain, and (3) what portion of the information and evidence the claimant is to provide. 

Also, the VCAA notice requirements apply to all five elements of a service connection claim. The five elements are: 1) veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. Dingess v. Nicholson, 19 Vet. App. 473, 484-86 (2006). 

The VCAA notice, as required by 38 U.S.C.A. § 5103(a), must be provided to a claimant before the initial unfavorable adjudication by the RO. Pelegrini v. Principi, 18 Vet. App. 112, 119 (2004). 

The RO provided pre- and post adjudication VCAA notice by letters, dated in September 2005, March 2006, November 2008, and August 2010. As for content of the VCAA notice, the documents complied with the specificity requirements of Quartuccio v. Principi, 16 Vet. App. 183, 186-87 (2002) (identifying evidence to substantiate a claim and the relative duties of VA and the claimant to obtain evidence); of Charles v. Principi, 16 Vet. App. 370, 374 (2002) (identifying the document that satisfies VCAA notice); of Pelegrini v. Principi, 18 Vet. App. 112, 119-120 (2004) (38 C.F.R. § 3.159 notice); of Dingess v. Nicholson, 19 Vet. App. 473, 484-86 (2006) (notice of the elements of the claim); and of Vazquez-Flores v. Peake, 580 F.3d 1270 (Fed. Cir. 2009) (evidence demonstrating a worsening or increase in severity of a disability and the effect that worsening has on employment). Further VCAA notice is not required.

To the extent that the VCAA notice came after the initial adjudication, the timing of the notice did not comply with the requirement that the notice must precede the adjudication. The timing error was cured by content-complying VCAA notice after which the claims were readjudicated as evidenced by the supplemental statements of the case, dated in May 2009 and January 2014. Mayfield v. Nicholson, 499 F.3d 1317, 1323 (Fed. Cir. 2007) (Timing error cured by adequate VCAA notice and subsequent readjudication without resorting to prejudicial error analysis.)

Duty to Assist

Under 38 U.S.C.A. § 5103A, VA must make reasonable efforts to assist the claimant in obtaining evidence necessary to substantiate the claim. The RO has obtained service treatment records, VA records, reports from private medical caregivers, records from the Social Security Administration, and afforded the Veteran VA examinations in December 2005, July 2009, September 2010, and April 2012. 

The reports of the December 2005, July 2009, September 2010, and April 2012 VA examinations and opinions included a review of the Veteran's medical history, including his service treatment records, an interview, and an examination of the Veteran, as well as sufficient findings to rate the disabilities and reasons to explain the opinions and conclusions reached. Therefore, the Board concludes that the VA examinations and opinions are adequate. 38 C.F.R. § 4.2; see Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (holding that when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate).

As the Veteran has not identified any additional relevant evidence pertinent to the claim and as there are no additional relevant records to obtain, the Board concludes that no further assistance to the Veteran in developing the facts pertinent to the claims is required to comply with the duty to assist. 

Reopening the Claim for Service Connection for a Skin Disability

Service connection will be granted if it is shown that the Veteran suffers from a disability resulting from an injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303. That an injury occurred in service alone is not enough; there must be chronic disability resulting from that injury. With a chronic disease as such in service, subsequent manifestations of the same chronic disease at any later date, however remote, are service connected, unless clearly attributable to intercurrent causes. If there is no showing of a resulting chronic condition during service, then a showing of continuity of symptomatology after service is required to support a finding of chronicity. 38 C.F.R. § 3.303(b). See also Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013) (The theory of continuity of symptomatology can be used only in cases involving those conditions explicitly recognized as chronic 38 C.F.R. § 3.309(a).) Service connection may also be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

The record establishes that the claim of service connection for a skin disability was denied in a rating decision dated in August 1994, which denied service connection for seborrheic dermatitis. The RO denied the claim on the basis that the evidence failed to establish a permanent residual or chronic disability since service and there was no presumption of service connection due to Agent Orange exposure. No appeal was taken from that determination, and it became final. 38 U.S.C.A. § 7105. In this regard, it is additionally noted that no additional evidence pertinent to the claim, to include Federal, VA, or uniformed services treatment records, were received within one year of the notice of the August 1994 determination. See 38 C.F.R. § 3.156(c).

The next communication from the Veteran regarding his service connection for a skin disability claim occurred in May 2010 when the Veteran filed a claim for service connection for disability that caused lumps over his body.

As a general rule, a claim shall be reopened and reviewed if new and material evidence is presented or secured with respect to a claim that is final. 38 U.S.C.A. § 5108 ; 38 C.F.R. § 3.156. When an appellant seeks to reopen a final decision, the first inquiry is whether the evidence presented or secured after the last disallowance is "new and material." 

Reopening a claim for service connection which has been previously and finally disallowed requires that new and material evidence be presented or secured since the last final disallowance of the claim. 38 U.S.C.A. § 5108; Evans v. Brown, 9 Vet. App. 273, 285 (1996); see also Graves v. Brown, 8 Vet. App. 522, 524 (1996).

Under 38 C.F.R. § 3.156(a), new evidence means evidence not previously submitted to agency decision makers. Material evidence means evidence that, by itself or when considered with previous evidence of record, relates to an unestablished fact necessary to substantiate the claim. New and material evidence can be neither cumulative nor redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened and must raise a reasonable possibility of substantiating the claim. 38 C.F.R. § 3.156(a).

When determining whether a claim should be reopened, the credibility of the newly submitted evidence is presumed. Justus v. Principi, 3 Vet. App. 510, 513 (1992). In order for evidence to be sufficient to reopen a previously denied claim, it must be both new and material. If the evidence is new, but not material, the inquiry ends and the claim cannot be reopened. Smith v. West , 12 Vet. App. 312, 314 (1990). The Court has held that there is a very low threshold for reopening claims, stating that the requirements in the regulations that the evidence "raises a reasonable possibility of substantiating the claim" should be read as enabling reopening rather than precluding it. Shade v Shinseki, 24 Vet. App. 110, 118 (2010).

Regardless of the RO's determination, that is, whether it re-opened a claim for service connection or not, the Board is not bound by that determination as to whether the claim should be reopened, and must consider whether new and material evidence has been received. Jackson v. Principi, 265 F.3d 1366, 1369 (Fed. Cir. 2001). 

The RO denied the claim for service connection for a skin disability because there was no evidence relating any current skin disorder to service. Since the prior final rating decision in August 1994, VA has received additional evidence, including VA treatment records, social security records, and lay statements by the Veteran.

The service treatment records from the Veteran's first period of active duty, October 1955 to October 1957, do not contain any complaints, treatment, or diagnoses involving the skin.

In his second period of active duty, the Veteran served in Vietnam from January 1970 to June 1971.

The service treatment record show the Veteran was seen in March 1972 for erythematous plaque in the groin area, which was believed to be herpes simplex. The April 1972 medical board examination, occurring shortly before separation, did not show any skin abnormalities. 

In January 1990, the Veteran was seen at VA for seborrhea. 

In April 1991, it was noted the Veteran had seborrheic dermatitis and in February 1992, he was prescribed a shampoo for dandruff in his scalp and other symptoms. 

In August 1995, the Veteran was treated for a single shallow erythematous lesion with well demarcated borders located in his chest.

In August 2005, a VA psychiatric note listed as medical problems of the Veteran included a neoplasm of the skin, actinic keratosis, a malignant neoplasm of the skin of the face, and basal cell carcinoma. 

In March 2007, the Veteran had multiple lipomas on his chest and arms in multiple areas. He stated that he had a prior resection of similar lesions in the 1970s. The lipomas were not currently causing him problems. 

In a January 2011 VA examination, the Veteran complained of skin lumps in his trunk and extremities that was diagnosed as lipomas. The examiner stated the etiology was unknown, but was not related to Agent Orange exposure according to recent medical literature. 

To summarize the foregoing, the Veteran has submitted evidence of at least one current skin disability, lipomas, that by his history have been an ongoing, although not necessarily constant problem since the 1970s, which raises the onset of his current skin disability to the time of service.

This evidence constitutes new evidence as it was not previously submitted to agency decision makers. It is not cumulative or redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened. It shows that the Veteran has current skin disability with reported onset in service.

As the Board must presume the credibility of the evidence, the evidence raises a reasonable possibility of substantiating the claim. The evidence shows a possible link between the Veteran's service and his current disability diagnosed as lipomas. The establishment of a current disability and the lack of a relationship between the disability and service were both reasons for the prior final denial and subsequently after the Veteran filed his claim to reopen the claim of service connection for a back disability. Therefore, the Board finds that new and material evidence has been received to reopen the previously denied claim of service connection for a back disability. 38 U.S.C.A. § 5108; 38 C.F.R. § 3.156(a).

As is addressed in greater detail in the REMAND below, further development is needed before reaching a decision on the merits of the reopened claim.

Increased Rating Claims

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. Separate Diagnostic Codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1.

VA has a duty to acknowledge and consider all regulations that are potentially applicable through the assertions and issues raised in the record, and to explain the reasons and bases for its conclusions. Schafrath v. Derwinski, 1 Vet. App. 589, 592-93 (1991). 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. 

The Board will consider whether separate ratings may be assigned for separate periods of time based on facts found, a practice known as "staged ratings." Fenderson v. West, 12 Vet. App. 119, 126-27 (1999); Hart v. Mansfield, 21 Vet. App. 505, 519 (2007).

Rating factors for a disability of the musculoskeletal system include functional loss due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40; see DeLuca v. Brown, 8 Vet. App. 202, 206 -07 (1995).

 With respect to joints, the factors of disability reside in reductions of normal excursion of movements in different planes. Inquiry will be directed to more or less than normal movement, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse. 38 C.F.R. § 4.45; see DeLuca, 8 Vet. App. at 206 -07.

Also with arthritis or periarticular pathology, painful motion is factor to be considered. 38 C.F.R. § 4.59. The intent of the Rating Schedule is to recognize actually painful, unstable or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59.

The Board recognizes that the evidence supporting the Veteran's claims for higher ratings for his disabilities includes his statements regarding the severity particularly pain. The Board has also considered the Veteran's lay statements that his disabilities are worse than currently evaluated. In evaluating a claim for an increased schedular disability rating, however, VA must consider the factors as enumerated in the rating criteria discussed below, which in part involves the examination of clinical data gathered by competent medical professionals. Massey v. Brown, 7 Vet. App. 204, 208 (1994). The Board is not free to ignore VA's duly promulgated regulations, which include the Rating Schedule. Franklin v. Brown, 5 Vet. App. 190, 193 (1993). The Board is bound by the law and is without authority to grant benefits on an equitable basis. See 38 U.S.C.A. §§ 503, 7104; Harvey v. Brown, 6 Vet. App. 416, 425 (1994).

Furthermore, in rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. See Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). 

Competency is a legal concept in determining whether lay or medical evidence may be considered, in other words, whether the evidence is admissible as distinguished from credibility and weight, factual determinations going to the probative value of the evidence, that is, does the evidence tend to prove a fact, once the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997).

In this case, the Veteran is competent to report symptoms because this requires only personal knowledge as it comes to him through his senses. Layno v. Brown, 6 Vet. App. 465, 469-71 (1994). He is not, however, competent to identify a specific level of disability of this disorder according to the appropriate diagnostic codes. That involves specialized knowledge or training in identifying injuries and diseases of the spine, knees, and wrist. Competent medical evidence means evidence provided by a person who is qualified through education, training, or experience to offer a medical diagnosis, statement, or opinion. 38 C.F.R. § 3.159. No factual foundation has been established that the Veteran is otherwise qualified through specialized education, training, or experience to offer a medical diagnosis. 

Such competent evidence concerning the nature and extent of the Veteran's disabilities have been provided by the medical personnel who have examined him during the current appeal period and who have rendered pertinent opinions in conjunction with the evaluations. The medical findings (as provided in the examination reports and the clinical records) directly address the criteria under which the disabilities are evaluated. As such, the Board finds these records to be more probative than the Veteran's subjective complaints of increased symptomatology

Increased Rating for the Lumbar Spine Disability

Disabilities of the lumbosacral spine are rated under the General Formula for Diseases and Injuries of the Spine (General Formula), Diagnostic Code 5242, or the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes (Intervertebral Disc Syndrome), Diagnostic Code 5243, whichever method results in the higher rating. The Veteran is currently rated at 60 percent under Diagnostic Code 5243, which is the highest rating available under the Intervertebral Disc Syndrome Formula. 

Under the General Rating Formula, Diagnostic Code 5242, in evaluating disabilities of the spine, the criteria is for application with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease.

Also any objective neurological abnormality may be separately rated under the appropriate Diagnostic Code.

The normal findings for range of motion of the lumbar spine are flexion to 90 degrees, extension to 30 degrees, lateral flexion, right and left, to 30 degrees, and rotation, right and left, to 30 degrees. 38 C.F.R. § 4.71a , Plate V. 

The next highest rating available to the Veteran under the General Rating Formula is a 100 percent rating, which will be assigned for unfavorable ankylosis of the entire spine. 

Ankylosis is immobility and consolidation of a joint due to disease, injury or surgical procedure. 38 C.F.R. § 4.71a , General Rating Formula, Note (5). Fixation of a spinal segment in neutral position (zero degrees) always represents favorable ankylosis. Unfavorable ankylosis is a condition in which the entire cervical spine, the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching.

In a VA examination in December 2005, the Veteran complained of sharp localized pain to his back with associated numbness to the lower extremities bilaterally. He did not have any bladder or bowel problems except nocturnal frequency. He has limited ambulation and needs occasional assistance putting on his shoes, socks, and clothes. Upon examination, forward flexion of the lumbar spine was 49 degrees, extension to 2 degrees, lateral flexion to 20 degrees bilaterally, and rotational flexion to 20 degrees bilaterally. Pain began at 49 degrees for forward flexion and at 2 degrees for extension. The Veteran had spasms and tenderness to palpitation to the L4, L5, and S1 paravertebral muscles. There was no sign of unfavorable ankylosis. The Veteran had decreased sensation in the left S1 dermatome, but the muscle strength and reflexes were normal except for an absent Achilles tendon reflex. The diagnosis was lumbosacral fibromyositis with bilateral S1 radiculopathy. 

In a VA examination in July 2009, the Veteran described sharp 8/10 pain with occasional radiculopathy to the left. He stated he was independent in activities of daily living with occasional help from his wife in dressing. He did not have any bladder or bowel problems, numbness, paresthesias, leg or back weakness, falls, unsteadiness, or fatigue. He complained of pain, stiffness, weakness, spasm, and decreased motion of the back. The Veteran felt the need to stay in bed but needed to constantly change position as a flare-up can occur if he remains in a static position. On physical examination, the Veteran had spasms, pain, and tenderness on his left and right side of the spinal muscles. There was no guarding, atrophy, or weakness. The Veteran's muscle strength was normal except his ankle plantar flexion and great toe extension were 4/5 bilaterally and he had decreased sensation bilaterally in the sacrolilliac dermatomes. The ankle jerk was hypoactive. Forward flexion of the lumbar spine was 50 degrees, extension to 10 degrees, lateral flexion to 10 degrees bilaterally, and rotational flexion to 25 degrees bilaterally. The Veteran had objective evidence of pain during his range of motion testing, but there was no change with repetition. X-rays demonstrated spondylotic and discogenic disease with moderate disc space narrowing. While his disability prevented shopping, exercise, and sports, it had a moderate effect on chores, recreational activities, travel, bath, dressing, and grooming. 

In April 2012, the diagnosis was lumbar myositis with right and left L4-L5 and L5-S1 radiculopathy. In addition, the Veteran had degenerative disc disease with right paracentral herniation at L1-L2 and mild midline posterior disc herniation of L2-L3. The Veteran stated his lower back becomes swollen, and he experiences localized back pain 7/10. It is difficult for him to walk. He experiences numbness and tingling below the knees. Forward flexion of the lumbar spine was to 60 degrees (with pain at 40), extension to 30 degrees (with pain at 15 degrees), lateral flexion to 30 degrees (with pain at 10 degrees) bilaterally, and rotational flexion to 30 degrees (with pain at 10 degrees) bilaterally. Repetition, however, reduced forward flexion of the lumbar spine to 20 degrees, extension to 10 degrees, lateral flexion to 25 degrees bilaterally, and rotational flexion to 25 degrees bilaterally. The examiner also noted weakened movement and excess fatigability. The Veteran's muscle strength was normal except his ankle dorsiflexion and great toe extension were 4/5 bilaterally and he had decreased sensation bilaterally in the feet and toes. The ankle reflexes were hypoactive. The examiner diagnosed radiculopathy involving L4 through S3. He described the severity as moderate. The Veteran used crutches or a cane to walk. 

After a review of the evidence, the Board has determined that the evidence does not warrant a rating higher than his current 60 percent rating. As noted earlier, 60 percent is the highest rating available under Diagnostic Code 5243. Under Diagnostic Code 5242, a 100 percent rating is warranted inly if the entire spine exhibits unfavorable ankylosis. To the extent the Veteran argues his disability picture more nearly approximates the criteria for a 100 percent rating because of the limited range of motion, although the VA examinations demonstrated significant loss of motion with the April 2011 VA examination showing additional loss of range of motion with repetitive movements, the changes did not more nearly approximate or equate unfavorable ankylosis of the entire thoracolumbar spine. There is evidence of difficulty walking, but not due to a limited line of vision. There is no evidence of ankylosis demonstrated by restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching.

In the absence of at least one of the foregoing signs or symptoms of unfavorable ankylosis of the thoracolumbar spine on VA examinations or in any other medical evidence of record, the disability picture does not more nearly approximate or equate to unfavorable ankylosis, the criteria for the 100 percent rating under the General Rating Formula for Diseases and Injuries of the Spine based on orthopedic manifestations. 38 C.F.R. § 4.7.
The Board also finds that there is no additional disability due to functional loss due to pain under 38 C.F.R. § 4.40 or additional disability due to functional loss due to weakness, fatigability, incoordination or pain on movement of a joint under 38 C.F.R. § 4.45 that would more nearly approximate the disability picture of unfavorable ankylosis with pain on use or during flare ups. 38 C.F.R. §§ 4.40 , 4.45, 4.59, DeLuca v. Brown, 8 Vet. App. 202, 206 -07 (1995). As already noted, painful motion was taken into account on the range of motion studies as noted in the VA examinations.

Nevertheless, the Board notes that the Veteran's lumbar disability included radiculopathy. The VA examinations demonstrate that the Veteran has had decreased sensation, muscle strength, and reflexes in his lower extremities which have been attributed by the VA examiners to his lumbar disability and have been described as moderate. The Board therefore finds that the Veteran is entitled to a separate rating for objective neurological abnormalities for each lower extremity. The Veteran's neuropathy of the left and right lower extremity is evaluated under 38 C.F.R. § 4.124a, Diagnostic Code 8520 for disabilities of the sciatic nerve, as analogous to radiculopathy or injury to the sciatic nerve as there is no separate diagnostic code for radiculopathy. See 38 C.F.R. § 4.27. Under Diagnostic Code 8520, mild incomplete paralysis of the sciatic nerve warrants a 10 percent rating. A 20 percent rating requires moderate incomplete paralysis of the sciatic nerve. A 40 percent rating requires moderately severe incomplete paralysis of the sciatic nerve. A 60 percent rating requires severe incomplete paralysis with marked muscular atrophy. An 80 percent rating requires complete paralysis of the sciatic nerve; the foot dangles and drops, no active movement possible of muscles below the knee, flexion of knee weakened or (very rarely) lost. 38 C.F.R. § 4.124a , Diagnostic Code 8520.

 The term 'incomplete paralysis' with this and other peripheral nerve injuries indicates a degree of lost or impaired function substantially less than the type pictured for complete paralysis given with each nerve, whether due to varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for the mild, or at most, the moderate degree. The ratings for the peripheral nerves are for unilateral involvement; when there is bilateral involvement, the VA adjudicator is to combine the ratings for the peripheral nerves, with application of the bilateral factor. Id. 

Words such as "mild", "slight", "moderate", "marked", and "severe" are not defined in the VA Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6.

VA examinations have demonstrated that he has decreased sensation and some loss of motor function in ankle movement and the great toe bilaterally. Based upon the evidence, the Board finds that the Veteran is entitled to a separate rating of 20 percent, but no higher, is warranted for radiculopathy of the left lower extremity and a separate rating of 20 percent, but no higher, is warranted for radiculopathy of the right lower extremity as the evidence of sensory and some motor loss indicates a moderate level of severity. The Board concludes that the evidence does not indicate that the Veteran's radiculopathy of the left lower extremity or radiculopathy of the right lower extremity each more closely approximates moderately severe incomplete paralysis as the main limitation appears to be sensory and to a lesser extent some motor loss. The motor loss affects the ankle partially and the great toe of each lower extremity. Otherwise, motor strength, measured at active motion against full resistance, and most reflexes were within normal limits. He had normal muscle tone with no muscle atrophy and no joint movement that was affected by the Veteran's radiculopathy disability. 

The Board acknowledges that the Veteran has difficulty walking and must use crutches or a cane. There is, however, no indication that the motor loss has limitations in walking due to the radiculopathy of the lower extremities. The Veteran, has other disabilities, the pain in the low back and knee disabilities that play a role. As discussed, he is already rated for the low back and he is also service connected for his right knee disability. To the extent that those disabilities account for the Veteran's pain, limited mobility, the evaluation of the same disability under various diagnoses, known as pyramiding, is generally to be avoided. 38 C.F.R. § 4.14. The critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). The Board has determined that the Veteran's overall loss of function has been recognized by not only the rating awarded for left leg and right leg radiculopathy, but also the ratings for the orthopedic manifestations of the low back disability and the right knee. To include all of the loss of function and symptoms accounted for in other service-connected disabilities, in the left leg or right leg radiculopathy disability, would violate the prohibition against pyramiding. 

Finally, the Board is informed by the April 2011 VA examiner's assessment that the Veteran's left and right leg radiculopathy is of a moderate severity. As noted above, however, the Board does not base its finding on just the examiners opinions, but for the other reasons expressed. There also is no evidence of severe incomplete paralysis with marked muscular atrophy or complete paralysis of any nerve; the foot dangles and drops, no active movement possible of muscles below the knee, flexion of knee weakened or (very rarely) lost. Therefore, a separate rating for the other nerves of the left or right leg under their appropriate diagnostic code is not warranted. 

Thus, the Board concludes that the evidence does not indicate that the Veteran's radiculopathy of either extremity more closely approximates moderately-severe radiculopathy. Since the symptoms of radiculopathy are mostly sensory, the schedular criteria require a finding of moderate severity, which warrants a 20 percent rating. There are no other diagnostic codes that apply. 

As the preponderance of the evidence is against a rating higher than 60 percent for lumbosacral fibromyositis , a rating higher than 20 percent for left lower extremity radiculopathy, and a rating higher than 20 percent for right lower extremity radiculopathy, the benefit-of-the-doubt standard of proof does not apply. 38 U.S.C.A. § 5107(b)




Increased Rating Claim for the Right Knee

Separate ratings for a knee disability may be assigned for limitation of flexion and for extension. VAOPGCPREC 9-04 (September 17, 2004). A separate rating may also be assigned for instability of the knee under Diagnostic Code 5257. Esteban v. Brown, 6 Vet. App. 259, 261 (1994) (laxity and loss of motion are separate and distinct disabilities).

The Veteran is service connected for status post right knee arthroscopy with meniscus repair, which has been rated at 10 percent at all relevant times since the Veteran filed his claim for a higher rating. The disability of the knee has been rated under Diagnostic Code 5257.

Subluxation or instability of the knee under Diagnostic Code 5257 is rated 10 percent for slight recurrent subluxation or lateral instability. Moderate recurrent subluxation or lateral instability is rated 20 percent. Severe recurrent subluxation or lateral instability is rated 30 percent. Words such as "mild", "slight", "moderate", "marked", and "severe" are not defined in the VA Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6.

Limitation of knee flexion under Diagnostic Code 5260 is rated 10 percent with flexion limited to 45 degrees. Flexion limited to 30 degrees is rated 20 percent, and flexion limited to 15 degrees is rated 30 percent, the maximum schedular rating under that Diagnostic Code. 

Limitation of knee extension under Diagnostic Code 5261 is rated noncompensable or zero percent with extension limited to 5 degrees. Extension limited to 10 degrees is rated 10 percent. Extension limited to 15 degrees is rated 20 percent. Higher ratings are afforded under this Diagnostic Code for more severe limitation of extension.

Normal range of knee motion is from zero degrees of extension to 140 degrees of flexion. 38 C.F.R. § 4.71 , Plate II.
As the Veteran's disability originated for an in-service injury and treatment for his right knee meniscus, the Board notes that under Diagnostic Code 5259, a 10 percent rating is assigned for surgical removal of a semilunar cartilage that is symptomatic. If the meniscus was not removed, a rating under Diagnostic Code 5258 for dislocated semilunar cartilage allows for maximum rating of 20 percent.

In a December 2005 VA examination, the Veteran gave a history of right knee arthroscopy with meniscus excision. Currently, he experiences pain and swelling with an increase attempting to squat, climb stairs, or even if he tries to fully flex his knee while lying down. He also complained of crepitus and locking. It becomes stiff with cold weather. He has been advised that he may need to have a total knee replacement. He placed the pain at 8/10. There are no dislocations or subluxations. His range of motion was 0 to 125 degrees with pain at the end. There were no additional limitations or changes with repetitions and the right knee did not exhibit any instability. The anterior, posterior, Lachman, and valgus/varus stress tests were negative, although the McMurray test was positive. The examiner noted crepitus upon examination but no swelling or effusion. There was no ankylosis. The Veteran did have an antalgic gait and used crutches. The diagnosis was status post right knee arthroscopic surgery with meniscus repair and degenerative joint disease of the right knee. 

In a VA examination in January 2009, the Veteran described his right knee pain as 6/10. He also had a recent total knee replacement of the left knee. He believes that the left knee symptoms and surgery caused an overload on his right knee. Walking, stairs, and bending caused an increase in pain. The Veteran described symptoms of instability, pain, stiffness, decreased speed of motion, numbness, and tenderness. He did not have symptoms of deformity, give way, weakness, incoordination, dislocation or subluxation, locking, or effusion. He can stand for 15 to 30 minutes and walk about a quarter of a mile but he always used a crutch. Upon examination, the examiner noted crepitus, but no clicks/snaps, grinding, or patellar abnormality. The McMurray test was positive but there were no tendon or bursae abnormalities. The right knee range of motion was 0-130 degrees and extension was normal. There was objective evidence of pain without any additional limitations with repetition. There was no joint ankylosis, or valgus/varus stress. In the examiner's opinion, the right knee disability prevented chores, shopping, exercise, and sports. It had a moderate effect on recreation, travel, bathing, dressing, toilet use, grooming, and driving. 

In a September 2010 VA examination that focused on the left knee, the examiner reported some signs and findings related to the right knee. The Veteran had crepitus, tenderness, pain, and a positive McMurray as well as grinding. He did not have clicking/snapping, locking, effusion, or dislocation. Flexion was 0 to 140 degrees with objective evidence of pain, but no change with repetition. Extension was normal. 

In April 2012 VA examination, the Veteran reported a cracking sound and pain when he walked. He has been offered but has so far declined a total knee replacement for the right knee. He also complained of less movement than normal, weakened movement, excess fatigability, and pain on movement. The Veteran had tenderness to palpitation to the joint line and soft tissue. Muscle strength was normal and there was no instability or dislocations/subluxations. He had flexion to 85 degrees, but pain began at 40 degrees. After repetition, his flexion was to 70 degrees. His extension was normal. The examiner stated the Veteran has residuals from the meniscus surgery of pain, swelling, and the cracking sound when walking. 

The Veteran's right knee limitation of motion disability does not warrant a rating higher than 10 percent at any time during the rating period for consideration on appeal. In this instance, however, at all relevant times, there has not been any medical evidence demonstrating instability of the knee. Accordingly, the Board finds that the Veteran is not entitled to an increased rating for instability under Diagnostic Code 5257.

The schedular criteria for a higher evaluation contemplate knee flexion limited to 30 degrees or less. Even with consideration of pain and repetitive use, as demonstrated on VA examinations, the right knee demonstrated at worst flexion limited to 70 degrees after repetition. Thus, the Board's finding applies even after considering functional loss due to pain, weakness, excess fatigability, swelling, deformity, atrophy, painful movement, and repetitive motion. See 38 C.F.R. §§ 4.40 , 4.45, 4.59.

While the Veteran did experience pain with flexion, the pain does not raise to the level of functional loss equating to flexion limited to 30 degrees. See Mitchell v. Shinseki, 25 Vet. App. 32, 43 (2011) (pain must affect some aspect of normal movement in order to constitute functional loss under 38 C.F.R. § 4.40). To this extent, the Board places greater weight on the objective findings of the VA examination, with consideration of pain, than the Veteran's subjective complaints.

Extension to 0 degrees in both knees does not more nearly approximate or equate to extension limited to 10 degrees. Therefore, a 10 percent rating for limitation of extension under Diagnostic Code 5261 is not warranted. There is no indication there would be additional functional loss due to pain, weakness, excess fatigability, swelling, deformity, atrophy, or painful movement, and repetitive motion. 38 C.F.R. §§ 4.40 , 4.45, 4.59.

The Board notes that the Veteran has been diagnosed with and treatment for a tear in the posterior horn of the medial meniscus. It is not clear if the entire meniscus was removed. Under Diagnostic Code 5259, a 10 percent rating is assigned for surgical removal of a semilunar cartilage that is symptomatic, the rating the Veteran is already receiving. If the meniscus was not removed, a rating under Diagnostic Code 5258 for dislocated semilunar cartilage allows for maximum rating of 20 percent. To the extent the tears have created symptoms that equate to symptomatic dislocated semilunar cartilage, Diagnostic Code 5258 rates the disability based upon pain, effusion, and locking. 

Either way, although the right knee appears to be symptomatic, there is no evidence of any symptoms are not already covered by Diagnostic Codes 5260, 5261, and 5257, and 38 C.F.R. § 4.59 (painful motion). To rate the same symptoms under Diagnostic Code 5258 or 5259 would violate the prohibition against pyramiding. Evaluation of the same disability under various diagnoses, known as pyramiding, is generally to be avoided. 38 C.F.R. § 4.14. The critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). To assess his meniscus knee disability with the orthopedic manifestations already evaluated by the degenerative joint disease rating and the instability rating would violate the rule against pyramiding. Cullen v. Shinseki, 24 Vet. App. 74 (2010) (within a particular diagnostic code, a claimant is not entitled to more than one disability rating for a single disability unless the regulation expressly provides otherwise). Stated another way, the Veteran's symptoms of painful motion, loss of motion, and instability are rated under the other noted Diagnostic Codes and 38 C.F.R. § 4.59 and a separate rating for a symptomatic meniscus would be duplicative or overlapping the other ratings, which is not permissible under 38 C.F.R. § 4.14 .

In sum, throughout the rating period on appeal, the criterion in excess of 10 percent for the right knee have not been met nor does the disability picture more nearly approximate the schedular criteria for a higher rating based upon instability under Diagnostic Code 5257 or a higher rating based on limitation of flexion under Diagnostic Code 5260. Further, there is no evidence in the record that establishes a limitation of extension of the right knee warranting a separate rating under Diagnostic Codes 5261. Finally, there is no evidence of other ratable pathology such as ankylosis, acquired or traumatic genu recurvatum, tibia and fibula impairment (malunion or nonunion) under Diagnostic Codes 5256, 5262, and 5263. The Board has thus considered the application of other diagnostic codes in order to afford the Veteran a higher rating but does not find any raised by the evidence. 

For reasons expressed, the current evaluations more accurately reflect the actual degree of impairment shown for the right knee for each disability since the respective effective dates for the awards of service connection, and there is no basis for staged ratings. In reaching the above conclusions, the Board has considered the applicability of the benefit of the doubt doctrine. The preponderance of the evidence, however, is against the claim for a rating higher than 10 percent for the right knee disability and that doctrine is not applicable in the instant appeal. See 38 U.S.C.A. § 5107(b).

Increased Rating for Residuals of a Chip Fracture, Right Ulnar Styloid

In this case, service connection has been granted for a chip fracture of the right ulnar styloid with a noncompensable (0 percent) evaluation Diagnostic Code 5211 for impairment of the ulna, The Veteran contends that his ulnar disability warrants a higher evaluation.

As the Veteran's dominant hand is the right hand, the disability is evaluated for the schedular criteria for a major (dominant) extremity. Under Diagnostic Code 5211 for impairment of the ulna, a 10 percent evaluation is assigned for malunion of the ulna with bad alignment. A 20 percent evaluation is warranted for nonunion in the lower half of the ulna . A 30 percent evaluation is assigned where the ulna his without loss of bone substance or deformity. A 40 percent evaluation is warranted where the ulna has loss of bone substance (1 inch (2.5 cms.) or more) and marked deformity. 

Diagnostic Code 5215 provides ratings based on limitation of motion of the wrist. Limitation of palmar flexion in line with the forearm is rated 10 percent disabling. Limitation of dorsiflexion to less than 15 degrees is also rated 10 percent disabling. 38 C.F.R. § 4.71a , Diagnostic Code 5215 .

The standardized description of joint measurements is provided in Plate II under 38 C.F.R. § 4.7la. For VA purposes, normal dorsiflexion of the wrist is from 0 to 70 degrees, and normal palmar flexion is from 0 to 80 degrees. Normal radial deviation of the wrist is from 0 to 20 degrees, and normal ulnar deviation is from 0 to 45 degrees. 38 C.F.R. § 4.71 , Plate I (2013).

In a VA examination in December 2005, the Veteran stated he was right handed. He complained of stiffness in cold weather but otherwise no discomfort, weakness, loss of endurance, or incoordination. The examiner noted the Veteran did not have any functional limitations because of the residuals from the chip fracture of the right ulnar styloid. He had 80 degrees palmar flexion and 70 degrees dorsiflexion without pain or any change after repetition. There was no functional limitation of the right wrist. There was no ankylosis. 
In July 2009, the Veteran was provided a joints VA examination and reported no change in his ulnar disability since the last VA examination. The examiner described the fracture residuals as stable. An X-ray report even stated there was no fracture. The Veteran did not report any give way, instability, deformity, pain, weakness, incoordination, decreased speed, dislocation/subluxation, and no effect on motion. The only symptom he reported was stiffness. The examiner elicited tenderness. Dorsiflexion of the wrist was 0-70 degrees and palmar flexion was 0-80 degrees. Right radial deviation was 0-20 degrees and right ulnar deviation was 0-45 degrees. The examiner stated there was no pathology to explain the Veteran's symptom which he said was pain, even though the Veteran only described stiffness. 

In an April 2011 VA examination, the Veteran stated his chip fracture of the ulnar styloid does no cause him problems. He did not have any complaints of pain or flare-ups. His palmar flexion was 0-30 degrees without any objective evidence of pain, although repetition reduced palmar flexion to 20 degrees. Dorsiflexion was 0-40 degrees, without any objective evidence of pain, although repetition reduced dorsiflexion to 20 degrees. There was tenderness to palpitation. Muscle strength was normal and there was no ankylosis of the wrist joint. The examiner reported functional loss of less than normal movement, weakness, excess fatigability, and pain on movement. The Veteran did not have ankylosis. 

After reviewing the evidence, the Board finds that a compensable rating under Diagnostic Code 5211 is not warranted. In this regard, the Veteran has not been shown to have malunion of the ulna with bad alignment or nonunion of the ulna, which could have warranted a compensable evaluation. There are no objective findings of bad alignment as required for the assignment of a 10 percent rating under Diagnostic Code 5211

There is also no evidence of, nor has the Veteran alleged that he experiences, multiple impaired finger movements due to tendon tie-up or muscle or nerve injury, which may be the basis for the assignment of a separate rating. 38 C.F.R. § 4.71a , Diagnostic Code 5211 Note.

The Board has also considered whether the Veteran may be awarded a compensable rating based upon limitation of motion of the wrist. As noted above, in most VA examinations, the range of motion for the wrist, both palmar flexion and dorsiflexion, have been normal. Only the most recent examination in April 2011 demonstrated any impaired motion. Palmar flexion was limited to 30 degrees, or 20 degrees after repetition, and dorsiflexion was limited to 40 20 degrees after repetition. As noted, at all earlier relevant times, the Veteran chip fracture residual disability demonstrated greater range of motion. The demonstrated functional impairment, including pain on use, does not more nearly approximate or equate to palmar flexion in line with the forearm (or zero degrees) or dorsiflexion to less than 15 degrees to warrant a 10 percent rating. 

The Board notes, however, that the evidence is equivocal as to whether the residuals of the chip fracture cause pain. Both VA examination reports in 2009 and 2011 state in some areas that the Veteran has pain and in other areas he does not. Resolving all doubt in favor of the Veteran, the Board finds that the Veteran does experience pain from the residuals of the chip fracture. As noted, the objective evidence of record does not show the criteria under the Rating Schedule to warrant a compensable rating. The intent of the Rating Schedule, however, is to recognize actually painful, unstable or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. Here, as the Veteran has a healed right wrist injury that is still painful, he is therefore entitled to the 10 percent rating. Further, the Board has considered the effect of pain, weakness, and lack of endurance under DeLuca v. Brown, 8 Vet. App. 202, 205 (1995); 38 C.F.R. §§ 4.40 , 4.45. The 10 percent rating assigned contemplates loss of function due to pain, weakness and lack of endurance.

As the evidence does not show ankylosis of the wrist or impairment of supination and pronation, Diagnostic Codes 5213, and 5214 are not applicable. 

The Board has considered whether there is any other schedular basis for granting higher rating for the right wrist disability, but has found none. The preponderance of the evidence is against a rating higher than 10 percent for residuals of a chip fracture of the ulnar rating and the benefit-of-the- doubt standard of proof does not apply. 38 U.S.C.A. § 5107(b).

Extraschedular Rating

Although the Board is precluded by regulation from assigning an extraschedular rating under 38 C.F.R. § 3.321(b)(1) in the first instance, the Board is not precluded from considering whether the case should be referred to the Director of VA's Compensation and Pension Service for a rating.

The threshold factor for extraschedular consideration is a finding that the evidence presents such an exceptional disability picture that the available schedular ratings for that service-connected disability are inadequate. This is accomplished by comparing the level of severity and symptomatology of the service-connected disability with the established criteria.

If the criteria reasonably describe the disability level and symptomatology, then the disability picture is contemplated by the Rating Schedule, and the assigned schedular rating is, therefore, adequate and referral for an extraschedular rating is not required. Thun v. Peake, 22 Vet. App. 111, 115 (2008), aff'd sub nom. Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009).

The Board notes that the Veteran has pain in his back with radiating symptoms to his lower extremities, with his right knee with constant symptoms, mainly pain and right wrist pain and stiffness. Musculoskeletal symptoms such as decreased range of motion, pain, stiffness, and weakness are clearly contemplated and provided for in the assigned ratings. The Board has considered the Veteran's lay statements and the medical evidence regarding his disability. The Veteran describes, as to those symptoms related to radiculopathy as decreased mobility, pain and numbness, and in the examination, also reported his impairment at work and his quality of life. More recently, it has resulted in muscle weakness, but he is still able to move either leg against some resistance. The Board has determined that such impairment of functioning is already encompassed in the rating criteria according to the diagnostic code for a radiculopathy injury or disability. Thus, as seen in the analysis above, the Board has considered these aspects of the Veteran's disabilities, and finds that the rating schedule adequately provides for ratings based on these symptoms or impairments. The Veteran also does not offer any explanation or argument to explain how the ratings assigned are inadequate to describe the symptoms and their effect upon his daily life. The evidence before the Board also does not establish any functional impairment that would not be covered or contemplated by the current schedular rating criteria.

A disability rating is intended to compensate for average impairment in earning capacity resulting from a service-connected disability in civil occupations. 38 U.S.C.A. § 1155. The degrees of disability specified in the rating schedule are generally considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. 38 C.F.R. § 4.1. 

Comparing the Veteran's current disability level and symptomatology to the Rating Schedule, the degree of each disability at issue is contemplated by the Rating Schedule and the assigned schedule ratings are, therefore, adequate and no referral to an extraschedular rating is required under 38 C.F.R. § 3.321(b)(1). 

Total Rating for Compensation Based on Individual Unemployability (TDIU)

A claim for a total rating is inferred in a claim for increase where the Veteran claims his disability affects his employability or such a claim is reasonably raised by the record. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Here, the Board notes that the Veteran has received TDIU since June 1995, which is before the dates the Veteran filed any of his current claims. Therefore, in the circumstances of this case, the Board declines to take jurisdiction over a TDIU claim.


ORDER

New and material evidence having been received, the claim for service connection for a skin disability is reopened, and to this extent the appeal is granted.
Entitlement to a rating in excess of 60 percent for lumbosacral fibromyositis is denied

Entitlement to an separate rating of 20 percent, but no higher, for radiculopathy of the left lower extremity, is granted subject to the laws and regulations governing the payment of monetary awards.

Entitlement to an separate rating of 20 percent, but no higher, for radiculopathy of the right lower extremity, is granted subject to the laws and regulations governing the payment of monetary awards.

Entitlement to a rating in excess of 10 for percent post right knee arthroscopy is denied.

Entitlement to a 10 percent rating, but no higher, for residuals of a chip fracture of the right ulnar styloid is granted subject to the laws and regulations governing the payment of monetary awards. 


REMAND

As to the reopened skin disability claim, the Veteran was provided a VA examination in January 2011. The examiner diagnosed lipomas and concluded that the lipoma disability was not due to Agent Orange exposure. No opinion was offered as to whether the lipoma disability was directly related to service even if the etiology was not related to Agent Orange exposure. See Robinson v. Shinseki, 557 F.3d 1355, 1361 (Fed. Cir. 2009) (VA is required to consider all theories of entitlement raised either by the claimant or by the evidence of record as part of the non-adversarial administrative adjudication process); Roebuck v. Nicholson, 20 Vet. App. 307, 31 (2006) (although there may be multiple theories or means of establishing entitlement to a benefit for a disability, if the theories all pertain to the same benefit for the same disability, they constitute the same claim).


In addition, the medical evidence indicates the Veteran has been diagnosed with seborrheic dermatitis, actinic keratosis, and basal cell carcinoma. Each diagnosis falls within the scope of the Veteran's claim for service connection for a skin disability. See Clemons v. Shinseki, 23 Vet. App. 1, 4 (2009). (scope of a mental health disability claim includes any mental disability that may reasonably be encompassed by the claimant's description of the claim, reported symptoms, and the other information of record.) As such, the Board has determined that an addendum be prepared addressing the other diagnoses and whether they are related to service

In a similar manner, the Veteran has filed a claim for service connection for a left knee disability. The Veteran has been diagnosed with a torn medial meniscus and degenerative joint disease. The examiner offered opinions as to whether the left knee diagnoses were caused by service and or the service connected disabilities of the right knee and the back. He did not offer an opinion whether the left knee disability is aggravated by the service connected disabilities. The examiner must offer opinions not only upon direct service connection, but also whether a given disability is caused or aggravated by service. Therefore, an addendum is needed for the left knee disability addressing aggravation. 

The Veteran has also filed a claim for an acquired psychiatric disorder, which he asserted is PTSD. In an April 2012 VA examination, the examiner stated the Veteran did not meet the diagnostic criteria for a PTSD diagnosis and he had an alcohol induced psychosis disorder. The examiner did not address all of the diagnosed psychiatric disabilities made by the Veteran's psychiatric care providers. 

In Clemons v. Shinseki, 23 Vet. App. 1, 4-5 (2009), the Court held that claims for service connection for PTSD also encompass claims for service connection for all psychiatric disabilities afflicting a Veteran based on a review of the medical evidence. A diagnosis that differs from the claimed condition does not necessarily represent a wholly separate claim. Rather, the diagnosis needs to be considered to determine the nature of the Veteran's current psychiatric condition relative to the claim. In this Veteran's case, the evidence demonstrates the Veteran has received multiple diagnoses for his mental health disability, including various forms of schizophrenia and for a depressive disorder. Further, there is no prohibition against a Veteran being service-connected for more than one diagnosed psychiatric disorder; see Amberman v. Shinseki, 570 F.3d 1377, 1381 (Fed. Cir. 2009) (noting that different psychiatric diagnoses may have symptoms that are not overlapping). The Board has determined that an addendum be prepared to determine whether the Veteran has more than one mental health disability and if so, as the Veteran may have more than one mental health disability that is service connected. Specifically, pursuant to Clemons, even if the examiner has determined that the Veteran does not have PTSD, the examiner should also determine if any other mental disorder is causally or etiologically related to service. As the evidence is insufficient to determine whether the Veteran has a current psychiatric disorder related to service, further factual development under the duty to assist is needed. 38 C.F.R. § 3.159.

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. Arrange for the examiner who conducted the April 2012 psychiatric examination, if available, prepare an addendum opinion, and if necessary, conduct a new examination. The claims file should be made available to the examiner in conjunction with the examination. All necessary testing should be conducted.

The examiner is asked to ascertain the nature and etiology of any current psychiatric disability, to specifically include schizophrenia, or depression. The claims file should be made available to the examiner in conjunction with the examination. All necessary testing should be conducted. The examiner is asked to determine:

a). Whether it is at least as likely as not (50 percent probability), the Veteran has any current psychiatric disability, other than PTSD or alcohol induced psychosis disorder, and, if so, 

b). Whether it is at least as likely as not (50 percent probability) that any psychiatric disability diagnosed other than PTSD or alcohol induced psychosis disorder had its onset during service or is causally and etiologically related to service.

The examiner is asked, if feasible, to reconcile the Veteran's diagnoses of alcohol induced psychosis disorder with the diagnoses that appear in the records namely schizophrenia and depression. The examiner should comment as to whether the current diagnoses represents a change in diagnosis, a progression of the Veteran's prior diagnosis, correction of an error, or the development of a new and separate condition. See 38 C.F.R. § 4.125.

A complete rationale must be provided for any opinion offered.

2. Arrange for the examiner who conducted the April 2011 VA knee examination, if available, prepare an addendum opinion, and if necessary, conduct a new examination. The claims file should be made available to the examiner in conjunction with the examination. All necessary testing should be conducted. 

The examiner is asked to provide an opinion as to whether it is at least as likely as not (50 percent probability or more) that the Veteran's current left knee disability was caused or aggravated by the Veteran's service connected right knee and lumbosacral fibromyositis disabilities

Aggravation is defined as a permanent worsening of the disability beyond the natural progression.

A complete rationale must be provided for any opinion offered.

3. Arrange for the examiner who conducted the January 2011 VA skin examination, if available, prepare an addendum opinion, and if necessary, conduct a new examination. The claims file should be made available to the examiner in conjunction with the examination. All necessary testing should be conducted. 

a). Whether the Veteran has any current skin disorder, or has had one at any point during the pendency of the claim, and, if so, 

b). Whether it is at least as likely as not (50 percent probability) that any skin disorder had its onset during service or is causally and etiologically related to service, including, but not limited to, Agent Orange exposure.

c). The examiner is asked to provide an opinion whether it is at least as likely as not (50 percent probability) that the Veteran's lipoma disability had its onset during service or is causally and etiologically related to service, even if not due to Agent Orange exposure.

The examiner is asked to specifically comment on the skin diagnoses of record to include seborrheic dermatitis, actinic keratosis, and basal cell carcinoma.

A complete rationale must be provided for any opinion offered.
4. After the development requested is completed, readjudicate the claims for service connection. If any benefit sought remains denied, furnish the Veteran and his representative a supplemental statement of the case and a reasonable period to respond, and then return the case to the Board.

The Veteran has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2013).



______________________________________________
ROBERT C. SCHARNBERGER
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs